The People of the State of Illinois, Petitioner-Appellee, *v.* Gerald
Sansone, Respondent-Appellant.

(No. 58310;

First District (2nd Division)—March 12, 1974.

Thomas Grippando, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Linda Conley, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This appeal arises from an order finding respondent, Gerald Sansone, in need of mental treatment and ordering his commitment to the Madden State Hospital pursuant to the Illinois Mental Health Code.[1] Respondent contends on appeal.

1. A determination that a mentally ill person is likely to injure others or himself requires proof of prior dangerous behavior; and in the absence of proof of prior dangerous behavior, civil commitment is preventive detention, and violative of due process;

2. The petition for emergency commitment was inadequate in that it did not meet the requirements of the Mental Health Code, and failed to meet the notice requirement of due process;

3. The standard of proof for civil commitment must be proof beyond a reasonable doubt, not preponderance of the evidence;

4. Respondent was unlawfully placed in former jeopardy in that he was found not to be in need of mental treatment in a prior civil commitment proceeding; and

5. Respondent was not certified within 24 hours after his admission to the hospital to be in need of treatment.

In an emergency petition[2] signed by Mrs. Mary Fleming, the assistant director of Social Services, Psychiatric Institute of the Circuit Court of Cook County, respondent was alleged to be in need of mental treatment. The petition stated that the facts may be established by the attached certificate of Dr. S. Lipkin. The space provided for the names of witnesses who would testify in support of the allegations in the petition was left blank. Petitioner based her belief that an emergency existed on "[h]istory of behavior and psychological and psychiatric ex-

---

[1] Ill. Rev. Stat. 1971, ch. 91½, par. 1—1 *et seq.*
[2] Ill. Rev. Stat. 1971, ch. 91½, par. 7—1.

amination done on August 18, 1972, at the Psychiatric Institute of the Circuit Court of Cook County."

On August 18, 1972, respondent was admitted to the Chicago Reed Mental Health Center. Within 24 hours of his admission, respondent was examined by a psychiatrist, Dr. Vieland. This certificate does not appear in the record, but its contents were read into the record by the assistant State's Attorney:

> "Patient is cooperative during interview, he is orientated, able to answer questions but is somewhat agitated, appeared to be delusional of grandiose nature. According to him he was U.S. Senator and, as far back as 1946 he was the only child lobbyist who was in Washington written about in newspapers. He was about 14 years old then and the diagnosis is schizophrenic paranoid type."

On August 25, 1972, the State requested that the hearing on the petition be continued to allow a more thorough evaluation of respondent's condition.

On August 30, 1972, the hearing was held, and respondent moved to dismiss the petition on the grounds that petitioner failed to state adequate reasons for her belief that an emergency existed, that the petition placed respondent in former jeopardy, and that respondent was not certified as in need of mental treatment within 24 hours after his admission to the hospital. The petition was orally amended by stipulation of counsel to add that respondent demonstrated delusions, confusion and impaired judgment. The trial court then denied respondent's motions.

A psychiatrist, Dr. Sarma, testified that he examined respondent on two occasions prior to the hearing, and found him "to be fairly orientated, but not completely orientated," and that respondent "showed quite * * * unrealistic thinking." Dr. Sarma found respondent to be suffering from "a thought disorder of a delusional nature." Respondent had told Dr. Sarma in an interview that he had been a Senator and Speaker of the House, and had campaigned with John F. Kennedy for the vice-presidency. He also related that he was police chief of Berwyn for 2 days, and that he had been arrested by a "cop who was crooked"; that people were always arresting him. He further related that his wife was shot on the White House lawn while he was a guard there, and that he had been shot through the head. At his first interview with Dr. Sarma, he stated that he had had an argument with him "the last time." He also stated that he had been arrested while he was ordering people from his property "on a federal order," and that persons were occupying his property illegally, and they were going to take his house, and that was the reason he was ordering them off his property. Dr. Sarma diagnosed

respondent as a paranoid schizophrenic, and recommended hospitalization. He testified that respondent's statements concerning his arrests and his ordering people from his property strongly indicated that respondent believes "people are after him."

On cross-examination, Dr. Sarma testified that respondent was not dangerous to himself and was able to care for himself, but that he could be dangerous to others in that he "might start a fight with someone telling them to clear off of his property." Respondent never stated to Dr. Sarma that he would fight or injury anyone. The doctor also stated that he had known delusional patients who were not dangerous to others, but "not with this kind of a delusional material," i.e., delusions regarding law enforcement and law officers. Dr. Sarma testified that he could not predict when respondent would become dangerous, and could not give any degree of probability of respondent's dangerousness.

On re-direct examination, Dr. Sarma testified that respondent would have difficulty functioning if he were released.

A social worker, Lynn Appelt, testified that she spoke to respondent during his first stay at the hospital (July 20, 1972, to July 28, 1972) after his arrest. Respondent was "quite cooperative," but did not remember the reason for his arrest. She stated that respondent told her that he had been shot in the eye 4 years ago, and that this occurred every 4 years, but that he did not know who the perpetrators were. After this interview respondent was returned to the House of Correction, and later readmitted to the hospital. On this occasion, he told the witness that one of his children had been shot, but he could not relate any facts of the shooting. He also stated that he had changed the title to his house three times because people were trying to take the house from him. Finally, he told the witness that Mary Fleming (who had signed the emergency petition) had murdered a person in his presence, and that there was a warrant out for her arrest.

On cross-examination, this witness testified that respondent was very cooperative in the hospital; that he never attempted to injure another patient. After an objection was sustained to a question regarding a prior commitment hearing, counsel made an offer of proof that the witness saw respondent in court earlier in the month, and that at that time respondent was found not to be in need of mental treatment.

Thereafter the State rested, and respondent offered no evidence. The court found respondent to be in need of mental treatment, and ordered his commitment for treatment.

The Mental Health Code (Ill. Rev. Stat. 1971, ch. 91½, par. 1—11) defines persons "in need of mental treatment":

"§ 1—11. 'Person in Need of Mental Treatment,' when used in

this Act, means any person afflicted with a mental illness, not including a person who is mentally retarded, as defined in this Act, if that person, as a result of such mental illness, is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs. * * *"

The provisions setting forth procedures in emergency admissions (Ill. Rev. Stat. 1971, ch. 91½, pars. 7—1 to 7—6) provide in pertinent part:

"§ 7—1. [Petition—Certificate of physician.]

When any person is or is asserted to be mentally retarded or in need of mental treatment and in such a condition that immediate hospitalization is necessary for the protection from physical harm of such person or others, any person 18 years of age or older may, in the county where such person in need of mental treatment or mentally retarded person resides or is found, present to the superintendent of a hospital a petition stating the reasons for such conclusion. Such petition must also state the name and address of the spouse or other nearest relative or, if none, of a friend of such person asserted to be in need of mental treatment or mentally retarded, if known to petitioner and, if not known, that diligent inquiry has been made to learn the name of such persons; the name and address of the guardian, if any, of the person asserted to be in need of mental treatment or mentally retarded; and the names of the witnesses by which the facts asserted may be proved. The petition may be prepared by the superintendent of any hospital, as well as by other persons. Such petition must be accompanied by the certificate of a physician not an employee of, or financially interested either directly or indirectly in, any licensed private hospital in which hospitalization is sought, certifying that the person is in need of immediate hospitalization as in need of mental treatment or is mentally retarded and the reasons for such conclusion. * * * Such certificates must be based upon a personal examination of the person asserted to be in need of mental treatment or mentally retarded, made not more than 72 hours prior to admission. Upon presentation of the petition and certificate to the superintendent, the patient may be admitted to or hospitalized in a hospital pending procedures specified in this Article."

"§ 7—4. [Copies of petition and statement to patient—Telephone calls.]

Within 12 hours after the patient's admission under this Article, the superintendent shall cause to be given to the patient:

1. A copy of the petition filed relative to the patient;
2. A written statement in simple, clear and concise terms stating that the patient will be examined relative to the allegations of the petition and will appear before a court for a hearing within 5 days, excluding Saturdays, Sundays and holidays, after the court receives notice of the patient's hospitalization. If the patient cannot read or understand the written statement, it must be explained to him in a language he understands and a note of such explanation and by whom made put into the patient's record.

Not later than 24 hours, excluding Saturdays, Sundays and holidays, after admission, a copy of the petition and written statement described in (1) and (2) of this Section must be given personally or sent by mail to the patient's attorney, the nearest relative of the patient reasonably ascertainable by the superintendent, other than the person executing the petition. The patient must also be asked if he desires such documents sent to any persons, and at least 2 of any persons designated by the patient must also receive such documents. The patient must be allowed to complete a reasonable number of telephone calls at the time of his admission to such persons as the patient chooses, but in no event may the number be limited to less than 2."

"§ 7—5. [Examination by psychiatrist.]

As soon as possible, but not later than 24 hours, excluding Saturdays, Sundays and holidays, after admission of a person pursuant to this Article, the superintendent shall cause the patient to be examined by a psychiatrist, who may be a member of the staff of the hospital but who may not be the physician who executed the certificate relative to the patient. If the psychiatrist does not, upon the basis of such examination, certify the patient to be a person in need of mental treatment or mentally retarded the patient shall be released forthwith."

"§ 7—6. [Filing of copies of petition and physician's certificate— Order setting hearing.]

Within 24 hours, excluding Saturdays, Sundays and holidays, after any person asserted to be in need of mental treatment or mentally retarded is admitted to a hospital under this Article, the superintendent of such hospital shall file, or cause to be filed, 2 copies of the petition and the physician's certificate in the office of the clerk of the court in the county in which the hospital in

which such person is hospitalized is located. Upon the filing of such petition and certificate, the clerk shall immediately present them to the judge of such court who shall set them for hearing at a time not more than 5 days, excluding Saturdays, Sundays and holidays, after the admission of the patient to the hospital. The order setting the hearing on the petition must direct that reasonable notice of the time and place of the hearing be served upon the patient, his attorney, if any, and the persons entitled to receive a copy of the petition pursuant to Section 7—4."

Inherent in civil commitment proceedings is the promise of the State, under a *parens patriae* theory, that the person who is being deprived of his liberty will receive treatment. Also inherent is the duty of the State to protect society from dangerous conduct of the mentally ill. The procedures set forth in the Illinois Mental Health Code are a legislative recognition that civil commitment is a deprivation of personal liberty, and their purpose is to provide adequate safeguards against unreasonable detention and commitment. Respondent does not contend that the procedures set forth in the Mental Health Code are violative of due process requirements.[3]

Although the United States Supreme Court has not had occasion to consider whether, and to what extent, constitutional guarantees apply to involuntary civil commitment processes, the Court has recognized "the danger of a deprivation of due process in proceedings dealing with persons charged with insanity * * *, and the special importance of maintaining the basic interests of liberty in a class of cases where the law though 'fair on its face and impartial in appearance' may be open

---

[3] Respondent relies on the recent case of *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis.), as authority for many of the arguments asserted herein. The federal district court there held the Wisconsin Civil Commitment Statute to be constitutionally defective insofar as it failed to require effective and timely notice of the charges under which a person is sought to be detained; failed to require adequate notice of all rights, including the right to jury trial; permitted detention longer than 48 hours without a hearing on probable cause; permitted detention longer than 2 weeks without a full hearing on the necessity for commitment; permitted commitment based upon a hearing in which the person charged with mental illness is not represented by adversary counsel, at which hearsay evidence is admitted and in which psychiatric evidence is presented without the patient having been given the benefit of the privilege against self-incrimination; permitted commitment without proof beyond a reasonable doubt that the person is both mentally ill and dangerous; and failed to require those seeking commitment to consider less restrictive alternatives to commitment. A perusal of the Illinois Mental Health Code demonstrates that an individual in Illinois is afforded many of the safeguards which the court in *Lessard* found to be lacking in the Wisconsin statute, and which the court held to be constitutionally required. (An appeal in the Seventh Circuit Court of Appeals is now pending.)

to serious abuses in administration and courts may be imposed upon if the substantial rights of the persons charged are not adequately safeguarded at every stage of the proceedings." (*Minnesota ex rel. Pearson v. Probate Court,* 309 U.S. 270, 276—77.) It is within this context that respondent's contentions must be considered.

Initially, respondent argues that to sustain a finding of likelihood of injury to respondent or others, proof of prior dangerous conduct must be adduced, and in the absence of such proof, civil commitment is preventive detention. Respondent asserts that, pursuant to the theory of *Robinson v. California,* 370 U.S. 660, confinement based upon a prediction of future dangerous conduct is confinement based upon status. Respondent relies upon *Cross v. Harris,* 418 F.2d 1095 (D.C. Cir.), and *Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D. Wis.), for the proposition that a prediction of future dangerousness must be based upon documented prior overt acts or threats.

The Illinois Mental Health Code defines a person in need of mental treatment as one who "is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally injure himself or other persons." [4]

■■ In the area of mental health law, the State must balance the curtailment of liberty against the danger of harm to the individual or others. The paramount factor is the interest of society which naturally includes the interest of the patient in not being subjected to unjustified confinement. We agree with respondent that the "science" of predicting future dangerous behavior is inexact, and certainly is not infallible. We also agree that the mere establishment of a mental problem is not an adequate basis upon which to confine a person who has never harmed or attempted to harm either himself or another. However, we are of the opinion that a decision to commit based upon a medical opinion which clearly states that a person is reasonably expected to engage in dangerous conduct, and which is based upon the experience and studies of qualified psychiatrists, is a determination which properly can be made by the State.

■■ Moreover, we cannot agree that commitment in the absence of evidence of prior harmful conduct is preventive detention based upon the patient's status as a mentally ill person. Again, we reiterate that a finding must be based upon an explicit medical opinion regarding the patient's future conduct, and cannot be based upon a mere finding of mental illness. Secondly, the purpose of the Mental Health Code is to

---

[4] Ill. Rev. Stat. 1971, ch. 91½, par. 1—11.

provide treatment, and in fact, the Code affords every patient the right to treatment.[5] This is a very different situation from that in *Robinson v. California, supra,* wherein the Court held that a law which imprisons a person afflicted with a disease inflicts cruel and unusual punishment. The Court in *Robinson* distinguished criminal punishment and detention from detention based upon laws which require medical treatment. (370 U.S. 660, 666.) Therefore, we hold that a finding of "in need of mental treatment," absent evidence of prior harmful conduct, is not *per se* violative of due process.

Respondent next contends that the emergency petition was inadequate and failed to meet the notice requirements of due process in that no facts were alleged upon which a conclusion of dangerousness could be based, and the names of no witnesses who could testify to the "facts" were listed in the petition.

■■■ A fundamental requirement of due process is "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314; *Robinson v. Hanrahan,* 409 U.S. 38.) The petition in the instant case was orally amended by stipulation of counsel to add that respondent was "delusional, confused and has impaired judgment." Proof of these facts could reasonably be anticipated to support a finding that respondent was in need of mental treatment. Due process does not require that a person be charged with a specific dangerous overt act, but that there be a nexus between the facts asserted and a finding of "in need of mental treatment." The amended petition was sufficient to advise respondent of the facts upon which a finding could be based.

Furthermore, we do not believe that respondent was unduly prejudiced by the failure to list the names of witnesses. § 7—1 of the Code requires that the petition list the names of witnesses who may prove the facts asserted in the petition. In order to provide respondent with the procedural safeguards intended by the legislature, this provision should be complied with. Although respondent could have ascertained prior to the hearing who was to testify, and his counsel could have asked for a continuance if he were surprised by the witnesses' testimony,[6] it is statutorily incumbent upon the State to provide this information. The State argues in response that at the time the petition was drawn, the names of witnesses were not known. We note that counsel did not raise

---

[5] Ill. Rev. Stat. 1971, ch. 91½, pars. 9—6, 1—9.

[6] Ill. Rev. Stat. 1971, ch. 91½, par. 9—4, provides in pertinent part: "Counsel shall be allowed time for adequate preparation  *  *  *."

an objection to the witnesses' testimony, and moreover, thoroughly cross-examined them. Upon our review of the totality of circumstances we do not believe that the petition was fatally defective.

Respondent also contends that the standard of proof required to commit an individual pursuant to the Mental Health Code must be the criminal standard of proof "beyond a reasonable doubt." The State maintains that it need only prove its case by the "preponderance of evidence" standard.[7]

The determination of the appropriate burden of proof "is the kind of question which has traditionally been left to the judiciary to resolve * * *." (*Woodby v. Immigration & Naturalization Service,* 385 U.S. 276, 284.) Our concern with the possibility of loss of personal liberty in commitment proceedings leads us to agree with respondent that the civil standard of proof by a preponderance of the evidence is inadequate. However, we cannot agree that the standard of proof should be "beyond a reasonable doubt." While both civil commitment proceedings and criminal proceedings may result in confinement, a person involuntarily committed pursuant to the Mental Health Code is entitled to treatment,[8] to review of his condition [9] and to release when he is no longer in need of treatment.[10] We are aware that until recently, civil commitment and incarceration have been synonomous terms. Our legislature has made a considerable effort to differentiate between persons in need of mental treatment and persons who have transgressed our criminal laws. Respondent relies upon *In re Winship,* 397 U.S. 358, and *In re Gault,* 387 U.S. 1, wherein the Court stated that "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards" in juvenile proceedings which could result in the loss of liberty. (*In re Winship,* 397 U.S. 358, 365.) However, the Illinois Mental Health Code not only utilizes civil labels and good intentions, but affords the individual a full panoply of due process protections. In our view the Code attempt to balance the interests of the individual and society in the administration, treatment and hospitalization of the mentally ill. Therefore, we are of the opinion that due process does not require the State to prove beyond a reasonable doubt

---

[7] Our research has led us to Illinois cases which held that incompetence must be proven by preponderance of the evidence. (*Titcomb v. Vantyle,* 84 Ill. 371; *English v. Porter,* 109 Ill. 285; *Lilly v. Waggoner,* 27 Ill. 395.) These cases, however, are clearly inapposite as they do not involve commitment proceedings, but merely causes of action to set aside conveyances. See also Ill. Rev. Stat. 1971, ch. 91½, par. 9—11.

[8] Ill. Rev. Stat. 1971, ch. 91½, pars. 9—6, 1—9.

[9] Ill. Rev. Stat. 1971, ch. 91½, pars. 10-1—10-3.

[10] Ill. Rev. Stat. 1971, ch. 91½, par. 10—4.

that a person is in need of mental treatment.[11] In fact, it may well be true that the difficulty in proving an individual's state of mind, combined with a stringent reasonable-doubt standard, may work a hardship on the individual who has a right to treatment and on society which has a right to protection.[12]

██ However, we reiterate that it is impermissible for an individual to be committed upon no higher standard of proof than applies in a negligence case. (*Cf. Woodbury v. Immigration & Naturalization Service, supra.*) Where the issue involved is not the occurrence of an event, but the determination of an individual's mental condition, the State must prove that the individual is in need of mental treatment by clear and convincing evidence. The facts upon which a medical opinion is based must be established by clear and convincing evidence, and the medical testimony upon which the decision to commit is based must be clear and convincing. In the instant case, respondent's delusions regarding law enforcement and law enforcement officers were established without contradition by the testimony of the psychiatrist and the social worker, both of whom interviewed respondent on two different occasions. The medical opinion was that respondent believed that persons were "after him," and that respondent could be dangerous to others. The psychiatrist testified that persons he had known with the same type of delusions had injured or attempted to injure others. Therefore, although the psychiatrist could not give any degree of probability of dangerousness, and although there was no evidence of prior dangerous conduct, the uncontradicted testimony established by clear and convincing evidence that respondent was in need of mental treatment.

Respondent's fifth contention is that he was placed in former jeopardy.

---

[11] Our Sexually Dangerous Persons Act (Ill. Rev. Stat. 1971, ch. 38, par. 105—1 *et seq.*) is a proceeding which is civil in nature, as is the instant proceeding. Because the Act provides for possible involuntary confinement, due process requires the application of certain criminal safeguards. (*People v. Nastasio,* 19 Ill.2d 524, 168 N.E.2d 728; *People v. Bruckman,* 33 Ill.2d 150, 210 N.E.2d 537.) However, our Supreme Court has consistently held that this does not mean that all criminal safeguards must be afforded to an individual. (*People v. Studdard,* 51 Ill.2d 190, 281 N.E.2d 678; *People v. English,* 31 Ill.2d 301, 201 N.E.2d 455.)

[12] The courts in *Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D. Wis.), and *In Re Ballay,* 482 F.2d 648 (D.C. Cir.), held that the reasonable doubt standard must be applied in civil commitment proceedings. In *Murel v. Baltimore City Criminal Court,* 407 U.S. 355, the Court dismissed a writ of certiorari as improvidently granted. The issue involved the civil commitment statute in Maryland. In a dissent Mr. Justice Douglas stated that he would require the reasonable doubt burden of proof. Other courts have specifically rejected this standard. *Fhagen v. Miller,* 65 Misc. 2d 163, 317 N.Y.S.2d 128, *modified and aff'd,* 36 App. Div. 2d 926, 321 N.Y.S.2d 61; *Tippett v. State,* 436 F.2d 1153 (4th Cir.); *Dixon v. Attorney General,* 325 F. Supp. 966 (M.D. Pa.). *Cf. United States v. Brown,* 478 F.2d 606 (D.C. Cir.).

Two weeks prior to the present hearing, another commitment hearing had been held, at which time respondent was found not to be in need of mental treatment. Respondent asserts that the State should be required to show that there has been a change in respondent's condition between the time of the two hearings, and that this change can be evidenced only by proof of an overt act of respondent.

■■ Initially, we reject respondent's assertion of former jeopardy. We have concluded previously in this opinion that, in view of the treatment purpose of involuntary civil commitment, all criminal safeguards are not required. However, even though not former jeopardy under the fifth amendment, misuse of multiple commitment proceedings would be violative of due process. (*Gomes v. Gaughan*, 471 F.2d 794 (1st Cir.).) In the instant case, an offer of proof was made which merely revealed that earlier the same month respondent had been found not to be in need of mental treatment. There was no offer of proof that the evidence presented at both hearings was identical or that the evidence introduced at the instant hearing was based upon the same examination, historical facts and diagnosis of respondent's propensities. (*Cf. Gomes v. Gaughan, supra.*) On the contrary, the date of the present petition for emergency treatment, and the dates of the examinations of respondent immediately prior to the hearing strongly indicate that there was a fresh and independent diagnosis of respondent's mental condition. Therefore, we conclude that the multiple commitment hearings were not so unfair as to violate due process.

Finally, respondent argues that the petition should have been dismissed for the reason that respondent was not certified within 24 hours of his admission to the hospital to be in need of mental treatment as required by § 7—5 of the Mental Health Code.[13] The record indicates that respondent was examined by Dr. Vieland within 24 hours of his admission. A copy of Dr. Vieland's report was not filed with the clerk of the court, but the contents of the report were read into the record by the assistant State's Attorney. Respondent was found to be delusional and somewhat agitated, and was diagnosed as a "schizophrenic-paranoid type."

Immediate examination and certification pursuant to § 7—5 is required to protect an individual from unjustified detention where no basis in fact exists for the detention. We are concerned that Dr. Vieland's certificate and Dr. Lipkin's certificate which was statutorily required to be attached to the petition were not filed with the court or formally placed into evidence. Although these documents were in the possession

---

[13] Ill Rev. Stat. 1971, ch. 91½, par. 7—5.

of the assistant State's Attorney, he did not deem it necessary to introduce them into evidence. We share the trial court's concern in this matter, and we agree that the better practice would be to file these certificates with the clerk so that they would formally appear in the record. Such a practice would alleviate the situation in which this court now finds itself—to determine the adequacy of a document which is not before it. However, it is clear that both documents were before the court and were considered by the court in determining the issues presented.

It appears that the trial court was convinced, after examining the report of Dr. Vieland, that it was in the nature of a certificate of "in need of mental treatment" as required by § 7—5. After the contents of Dr. Vieland's report were read into the record, the following colloquy ensued:

"Counsel for Respondent: Your Honor, nothing in that statement the doctor felt he was in need of mental treatment [sic]. The doctor never stated that on the certificate.

\* \* \*

Assistant State's Attorney: But he was examined within the 24 hour period, and the code states that if the doctor doesn't feel that he's in need of further mental treatment, he should be discharged otherwise the hospital has a right to keep the patient for further treatment.

\* \* \*

The Court: And from the form that was used, I presume, that its [sic] in a form different than a form that is ordinarily used for certificates.

Assistant State's Attorney: Yes.

The Court: [B]ut, I'm not going to allow the fact that its [sic] on a form different than ordinarily used to invalidate the proceedings.

\* \* \*

Counsel for Respondent: We're relying on the sentence that says, if the psychiatrist does not have a basis for such examination certify the patient to be a person in need of mental treatment or mentally retarded a patient shall be released thereof [sic].

The Court: Well, he wasn't released, was he?

Counsel for Respondent: He, he wasn't. Therefore,—

The Court: Well, I'm, I take the position that, that document that's in the record is in the nature of a certificate of a person's need for hospitalization."

■■ Thus it appears that Dr. Vieland did not submit his report on the standardized certificate form normally used, and that he did not use the

words "in need of mental treatment." Upon our review of the totality of the circumstances, we are constrained to agree with the trial court that, although the appropriate form was not utilized by Dr. Vieland, his report is in the nature of a certificate that respondent was in need of mental treatment, and that the failure to explicitly certify to such a finding is not reversible error.

For the foregoing reasons, we hereby affirm the order of the trial court.

Affirmed.

HAYES, P. J., and DOWNING, J., concur.